My name is Richard Lorenz. I'm with the Cable Houston Law Firm. I'm representing Klatske and I, People's Utility District. My colleague here is Mr. Don Brookhiser. He's representing Georgia Pacific. We'd like to split our time ten minutes each, and Mr. Brookhiser has asked to reserve two minutes of his time, if that pleases the Court. Would the Clerk please make it 10-10? Thanks. I apologize in advance if I get going too fast. I have a lot of things I want to cover, and I'm excited to be able to talk to you, so slow me down if you need to. I appreciate the fact that the Court was able to pose the question to us ahead of time. I'm trying to figure out why we would have jurisdiction to review the BPA rate-making decision when FERC hadn't approved it yet under City of Seattle v. Johnson. I think we're all thinking about that. Yeah, exactly. And as I was going to say, thank you for letting us think about that ahead of time because it allowed me to come up with a better answer than I might have off the cuff, which is you do have jurisdiction here, and the City of Seattle case, we think, is distinguishable on the facts. As you well know, the issue there was that there's a principle in the Regional Act that says that rates established by Bonneville aren't final until they've been reviewed by FERC and FERC has completed its process. What was at issue in City of Seattle was whether a particular availability charge was or was not a rate. The Court found that it was. Because it affected the rate. The Court found that the availability charge was a rate. It was a charge for service of some nature, so FERC had to review it, and they did, and this Court did not have jurisdiction until that was complete. We find this case to be different from that because the TRM, the tiered rate methodology that's been adopted by Bonneville, is not a rate based on Bonneville's own characterization of it. It is not subject to FERC review, again, based on Bonneville's own characterization of it, and it is final currently. So we think that that, on its face, differentiates the City of Seattle. Now, I know where we're going here, so I'll go right there, which is the fact that Bonneville has voluntarily submitted it to FERC for review. Does that affect your jurisdiction here? And I think the answer is no. The answer is no for the following four reasons. Number one- Pardon me, Counsel. The tiered methodology is a choice which the industrial users or the investor-owned utilities made. They could have gone by the old melded system, melded rate system. The tiered methodology has two tiers, a cheap tier and an expensive tier. The cheap tier is cheaper than the expensive tier. The rates at which you charge the cheap tier is different from the rates at which you charge the expensive tier. Why is that a rate? So you've now put me in the awkward position of having to defend a decision made by Bonneville, and I think that they'll be able to give you a better answer than I will, but from our perspective, I'll give you two answers. A rate is a price you pay. Here's where we would go under this Court's case law is the California Energy Resources v. BPA decision, where it said that when Bonneville makes a decision on how to allocate resources, that that type of policy decision, in that case, it dealt with a policy on how to allocate its transmission resources, but that type of decision is not necessarily a rate and in that case was not subject to first review. And the other point- This isn't an allocation of resources. It's a price to be paid for a certain amount of energy up to what is now considered a conservation level and another price to be paid above that consumption. In other words, they're saying if you're good boys and you don't use too much energy, you pay a lower price, but if you're wasteful and you're using more energy, you will pay a higher price. Price. What's the difference between price and rates? Well, I appreciate your perspective on that and your questioning, and our perspective is that it's the nature of the methodology. It's not just a high rate and a low rate. It's an allocation of the federal base system. The low rate, tier one rate, is allocating these resources one way, and then the high rate is it's not just different rates. You're constructing an abstraction to get away from the dollar cost, but it's still a question of how much money is being paid for electricity, is it not? Ultimately, that will be the case, and Bonneville will set rates under this TRM, but I submit to you that they haven't done that yet. When they do, there's no question that that will be subject to first review. I'm not following something. I'm not just looking at Johnson. I'm looking at the statute that Johnson is based upon, and when I look at 839FE, judicial review, it says the following action shall be final action subject to judicial review, and I thought that what mattered here was subsection 4D, rate determinations, subsection 4D, rate determinations pursuant to section 839E shall be deemed final upon confirmation and approval by FERC. Are you saying that I should be looking at some other subsection, that this is not an 839E or what? Well, again, based on Bonneville's characterization of its own record of decisions. Before you give me the arguments for why it should be so, tell me what subsection to look at, and then I'll understand the arguments for why it should be so. Well, again, I think Bonneville is going to give you a more satisfactory answer than I can. If you leave me with subsection 839FED or FE4D, then I'm just referred over to FERC for finality, and I know FERC hasn't ruled yet, so it's not final. So what I'm really looking for is some other slot. The statute has a bunch of them. Is there one? So, again, I'm not sure which slot Bonneville would put this in. I know that they say clearly that it's not in the act. What slot would you put it in? I would put it in ñ I don't know that there is a slot in the act that I would put it in. Again, I think that this was a more fundamental decision about how it was allocating the federal-based system. And, again, I think that that, from our perspective, we have a limitation under the act, which is we have 90 days in which to file an appeal if we choose to do so, and we have to exercise that right or waive it based on when Bonneville says they've made a final decision. So we get a document. Bonneville says, hey, this is final. We're not sending this to FERC under this provision of the act that requires us to do so. So we can't wait. We have to file this appeal, and if the answer from the court is Bonneville does have to send it to FERC for review, then we'll have to refile later after that. So I don't think that we're necessarily in a position where we feel like we have to defend that decision. We're in a position where we have to file an appeal or not based on the action that Bonneville took. What statutory provision gives us the power to exercise judicial review? Well, it's Section 95 of the Regional Act. Could you put that in USC terms? I can. I'm going to ask my colleague to do that for me so I don't waste your time. Sure. The provision is any final action by the administrator may be appealed directly to this court of original jurisdiction within 90 days. They say it's a final action. We have to appeal. There we are. Let me ask you another question also relating to ripeness, but that was troubling me. It seems, if I understood, I'm not sure whose argument this was, but I hope it was yours, but it seemed like the key argument that was challenging the tier great methodology issue on this argument was or the gist of the argument was the tier two rates were indistinguishable from the NLSL rates. Is that your argument? I think that's one layer of the argument. I think ICNHU, the industrial customers, made that argument most persuasively of the group of petitioners. The thing that we want to impress upon you is that what Congress was doing in the Regional Act was setting up two types of rates. It was allocating the Federal-based resources so you have a dichotomy, customers that get Federal-based resource, cost-based rates, and Federals that get incremental market rates. But there's nothing wrong with that, right? There's nothing wrong with that under the statute because 71 says it could be rate or rates. So I understood that the key argument was, yes, but by doing that, you're making tier two rates equivalent to these new source rates. And that was something that we clearly couldn't tell until the rate making was in process. Equivalent in the sense that they are moving these new CFCT loads when they come online from an FBS-based rate, protected rate that gets the benefit of the Federal-based system, to a rate that's based on incremental market purchases. So they are going from protected status to unprotected status. But how can we know the actual effect of the tier one and tier two rates compared to the new source rates until the rate making proceeding has been completed? And that was where I was hung up on the ripeness issue. I don't think that we know the monetary effect today. But what we do know, which was put well to me earlier, which is the tier one rate is the FBS-based rate. That's going to be the cheapest rate. The tier two rate is not an FBS rate. It is an incremental market rate, and so is the NR rate. Well, we don't know. And BPA makes the argument that it's going to be different because of the way it's structured. And that seems like we couldn't make an evaluation that there was some structural error in their final action until we know how the rates turn out. Well, I'm out of time, but let me answer your question just by saying this, that what the Act does not do is it does not merely say that the rate charged to CFCT has to be something different than the NR rate. What it says is those have to be an FBS cost-based rate. And we know now that new CFCT loads won't get that benefit. Whether tier two is much cheaper, slightly cheaper, or exactly the same as the NR rate, we know they're not getting the protection that Congress wanted them to get. Okay, that's a slightly different argument. Okay, thank you. Thank you, counsel. May it please the Court, my name is Donald Brookhiser, and I'm appearing on behalf of Georgia Pacific. I'm primarily going to address two issues, the discrimination claims and Georgia Pacific's claim of the takings. But let me briefly address the Court's question about jurisdiction in the city of Seattle issue. The tiered rate methodology is simply a methodology by which Bonneville will set rates or prices later. The tiered rates methodology itself does not set a price. This Court has dealt with this issue on several occasions, and it seems that the distinguishing factor is whether the decision actually sets a charge or a rate. The statute says that FERC will review rates to determine whether they're adequate to collect all costs and return the federal investment. Clearly, in order for FERC to do that, there has to be, number one, a rate to look at, and number two, a revenue requirement or a set of costs to determine whether the rate is adequate or not. Neither of those are provided by the tiered rate methodology. And let me just refer the Court to the case of Association of Public Agency Customers v. Johnson at 813 Fed Second 1364. I'm sorry. Wrong case. There's a lot of those Johnson cases. Yes. That's the one we were discussing. Johnson.   I'm sorry, Your Honor. You don't want to talk about that. I will find it in a second. But the Court has on several occasions found that where BPA is approving a method or has approved a methodology rather than setting a rate, that that's a, quote, final action that this Court has jurisdiction to review immediately. Which subsection of A39FE, does that fall under? E1. E1. Okay. And there's A through H, B1. E1 provides that, quote, only final actions are subject to judicial review. Correct. And lists final rate determinations as being among those reviewable actions. There hasn't been a rate determination. So which of those subsections? Are you saying it's 1A, adoption of a plan, or which one? I'm sorry. I don't have the statute in front of me, but I think it's the catchall at the end that says all other final actions. It doesn't say that. Are you talking about H? Are you sure you don't have the statute right handy there? I mean, this is what we're doing the case about. Any rule prescribed by the administrator under A39EM2 of this title? Is that what you're talking about? Yeah. Well, are the – is the tiered methodology that you challenge a rule under A39EM2? Thank you. I apologize. I don't have the statute in front of me. May I submit that? That's okay. But just tell us what to look at. Well, the statute says that this Court has jurisdiction to make judicial review of, and there are several types of actions or plans. It's not a pure catchall, though, at H. And I just found EM2. Something about payments made under this subsection shall be determined by the administrator pursuant to a region-wide uniform formula to be established by rule and so forth. This case is so complicated, we just need the guidance for what provision to look at. Thank you. 839F5. 839F – F – E5? F – 839F. So 839F – E5. Yes. F – E5. E5. E5. Okay. Oh, that's a different section. Suits to challenge the constitutionality of this chapter or any action they're under, final actions and so forth? Yes. Got it. And so this Court has jurisdiction to review the methodology as a final action, and it does not need to wait for FERC approval, which BPA has not sought, because it is not a rate. Okay. Can I move to the Georgia Pacific's takings claim just briefly? Yes. Help me understand what you're seeking, because as I understand it from the brief, if you're asking for damages, for just compensation, then we lack jurisdiction under the Tucker Act. But if you're asking only for declaratory relief and an injunction, then we might have jurisdiction, assuming we have jurisdiction anyway under this rateness ratemaking issue. Can you clarify that for me? Yes. This Court has jurisdiction to deal with takings claims, where they arise from or are the direct result of a final action by BPA. I think that the Tucker Act deals with monetary damages that arise from contract actions or any other actions separate from a final action of BPA. So you're saying that the BPA provision that we just looked at, giving us jurisdiction, you're saying that supersedes the Tucker Act with respect to any damage claim has to go to the claims court. Is that correct? That's correct. And in our reply brief, we cite the Pacific Power and Light case, which basically stated that when you're dealing with a final action of BPA, this Court has exclusive jurisdiction, and that jurisdiction includes any other claim related to or arising out of that action. Now, if we disagree with that, can you now tell me anyway what it is that Georgia Pacific is seeking, or are you seeking damages or injunctive relief? We are seeking damages or some corrective action that will make us whole. The injury is that the value of the mill as an ongoing concern has been diminished by this methodology. Part of that going concern value includes the contract between the mill and its public utility district. Now, is there any way for us to know that until rates are set? Because you're not even paying rates directly to BPA. It's going through your local utility, and the local utility doesn't know what rates it's going to be paying under this Tier 1, Tier 2. There could be less. It might pass on the savings to Georgia Pacific. Yes, Your Honor. But the damage is to the going concern value of the plant now because of that uncertainty. And so the result that we seek are corrective actions that will remove that uncertainty. So you're saying the takings is an uncertainty? No. The taking is the imposition of that uncertainty or creation of that uncertainty because up until this point, Georgia Pacific has been able to rely on its contract with Klatskan I and all of the rights that go with that contract. That includes the rights as a CSCT load. And this decision takes away that right, therefore diminishing the value of that contract. The corrective action that we seek are things that have been suggested in our reply brief and were suggested in the testimony of ICNU that would include setting aside some additional Tier 1 capacity, as BPA has done for new publics, set aside additional capacity for CSCT load. Are you saying that it's unconstitutional to set up this methodology that creates uncertainty because the uncertainty diminishes value and therefore it falls into subsection 5? It takes away one of the rights of Georgia Pacific. It's just like or analogous to the Siena Gardens decision that we cite in our brief. The problem I have understanding that, if I am understanding it, which I may not, is it seems like that eliminates any kind of finality rule at all. As long as they're setting a rate, that's unconstitutional because it creates uncertainty and uncertainty diminishes the value of your asset. And once they do set a rate, then you can challenge it because it's a final rate. And that means you can bring a challenge any time during the process. Well, my concern is that when BPA finally does set rates using the TRM, that BPA will argue that the TRM was a final action already adopted. A chance to address the mechanism of the methodology will have passed. Can't you? Excuse me a second. When the rate is adopted, we can attack the rate itself or challenge it and the way in which it was calculated, but not the methodology itself. Can't you avoid your uncertainty by simply saying we don't want to accept the TRM? We just want to be serviced under the old melded rates with billing credits, et cetera, et cetera? Thank you for raising that again. No, because... Why not? Well, because the choice of the melded rate is offered to an individual utility. It's not offered to the group of preference customers as a whole. So as we look at it, the choice between taking all of our service at a melded rate or the utility service at one melded rate versus taking service under Tier 1 and under Tier 2 will yield the same result. The melded rate is going to be the cost of BPA's existing resources to serve part of the load and the cost of new resources to serve the remainder of the load. Tier 1 will be the cost of BPA's existing resources to serve part of the load. Do you claim the melded rate was a taking? I'm sorry, which melded rate? The offer of the new melded rate? Yes. No, because it wasn't taken by Klatsk and I, but it... You're saying that that option is not available to Georgia Pacific. It's available only at Klatsk and I. Correct. Okay. Thank you. Thank you, counsel. Thank you. Counsel. Good morning, Your Honors. May it please the Court, my name is David Adler, representing Respondent Bonneville Power Administration. In light of this Court's order, I will be solely responding to the Court this morning. Counsel for Respondent Intervenors will not be participating in oral argument in this case. The first issue I would like to address, of course, is the issue of this Court's jurisdiction and questions regarding the City of Seattle case. First, with respect to the questions you've been asking about under what provision of the statute do you have jurisdiction, it's really what was section 9E3 of the Northwest Power Act, which is 16 U.S.C. 839 F.E.3. That has been described by this Court as a catch-all. 839 E? F.E.3, yes. That's been described by this Court on numerous occasions as kind of a catch-all. And the reason is that in section 9E1 of the Northwest Power Act, which is 839 F.E.1, Congress listed eight enumerated final actions that are subject to this Court's review, but those were not exclusive. So Congress included section 9E3 or 839 F.E.3 to basically be almost like a savings clause to catch anything else there that was not specifically enumerated. So that is the provision under which this Court has jurisdiction in this case. And we do believe that the tiered rate That's the provision that says nothing shall be construed to preclude judicial review of other final actions and decisions by the counsel or administrator?  How do we know what's final? Well, we believe, I think there's a couple of ways of knowing. And what this Court has frequently done in the past has applied, when there's been a question, it's applied the two-part test of Benepe Spear. The concern of your adversaries is that if they wait to challenge the rate after FERC has approved the rate, then they'll be told, well, you can't challenge the system, the methodology for establishing the rate anymore. Too late for that. Well, I think there's some merit to the fact that once a final action is taken, there is the 90-day clock. And the decision, the decisions that are made and embodied in that final decision are unreviewable after that 90 days has passed. Will the methodology, is that a final decision? That is a final decision, Your Honor. And we said so within the context of the tiered rate methodology record decision itself. We, of course, represented that to the Court as well. And we find it to be a final decision because under the Benepe Spear test, we think it does satisfy the two-part test. That is, first, we believe it is the consummation of the agency's decision-making process. And second, we believe it also does fix legal rights obligations and have a legal impact. But you think we do have jurisdiction to review the final action of the administrator with respect to the adoption of the TRM? That's correct. We believe you do, Your Honor. How does it fix any legal rights? It would seem to me that what you're doing is you're saying, here's how we're going to set your rates. But at this point, you don't know what's a dollar based on what we say is going to be the system. And we don't owe you a dollar. And we don't know what the number is going to be. That's exactly right. We don't. And what this is, the tiered rate methodology is essentially a foundational piece. It is the piece that's going to be a critical input into the development of the rates. But it's not the rates. Usually courts like to avoid interlocutory review, where you review each piece separately. And this seems to me to be a way of establishing interlocutory review so that we wind up being kind of the supervisory board for the Bonneville Power Administration at each step of the process. Well, you know, the rationale, if I could, behind this was that the tiered rate construct was a new one for Bonneville as well as its customers. And Bonneville determined that it would be most advantageous to Bonneville and its customers, and the customers believe this as well, to develop these new contracts on a parallel track with this tiered rate methodology so that there would be much greater understanding and much greater certainty as to how these contracts ultimately would work, especially given the fact that there were going to be these 20-year contracts. So we kind of developed these, the tiered rate methodology and the contracts on a parallel path. But the tiered rate methodology just sets up the design, the methodology. That's my concern. There are different reasons for avoiding interlocutory review, which is essentially what we're talking about here. It's kind of like reviewing a routine fender bender after each discovery decision and each motion decision. We never do that. In this case, it's not as silly as that. On the other hand, there's a huge intellectual investment by the court that goes into understanding each of these cases as it comes up. And to have to repeat it at each stage of the very extensive process is awfully burdensome. And I'm not sure that I see why we should review the methodology as a final action when, at this point, it's just in the air. There's no rate that's been set. And we know that the rate is going to be up to FERC. Right. The rates themselves will certainly be developed in the rate proceeding, then it is for FERC to confirm. Will FERC be able to say when it reviews the rate, well, we don't approve your rate because we think the tiered methodology was wrong? Will FERC be entitled to say that? Well, you know, it's kind of almost a thin line with respect to the extent of FERC's jurisdiction over Bonneville's rates. FERC reviews Bonneville's rates primarily to determine total cost recovery. That is, if Bonneville's rates will recover all of the costs that Bonneville needs to, to meet its obligations under the statute. Now, it does not have jurisdiction to actually specifically review rate design or a methodology in this instance. So FERC will not be entitled to say your methodology is wrong? See, this factors in a little bit to why we have the methodology, why we submitted this to FERC in the first place. If you recall, we, Bonneville, as a discretionary matter, after the methodology was developed, elected to file a request with FERC to review it to determine if FERC would have any, could flag any concerns in advance, basically. If we could find out a little bit ahead of time if there are any problems FERC might see with the methodology, even though technically it is not within the scope of FERC's jurisdiction, this is still pending before FERC. The significance here is that, for instance, once FERC comes back to us with a response to Bonneville's petition. So is FERC looking at the tiered methodology right now just as we are? It is looking at it. But do they have any authority to review it? I didn't see that in the statute. What's their authority to review your methodology? It's not specific to review the methodology itself. That's why Bonneville requested it strictly as a discretionary matter. Let me ask you about the methodology for a moment. Let's assume that we can look at this methodology that BPA has adopted, the tier 1, tier 2 methodology, to see whether it violates your controlling statute. There's some sort of statutory violation. As I understood the argument, this is the same question I raised to opposing counsel. The problem, the structural problem is that the tier 2 rates are going to be the same as the new source rates. It would be the new resource cost. And that's not allowed because that puts the contracted for and committed to rates into the same class as the new resource rates. And BPA makes some arguments, no, it's not the same. But I wasn't exactly clear as to why it wasn't the same because, obviously, you're going out and buying, you're looking at a market rate. Well, it's actually, from Bonneville's perspective, there's no merit to the argument at all. And there's no merit because the rates have to be developed following specific statutory criteria. And the statutory criteria are different for developing what will be the tier 2 PF rate. Bonneville's preference rates essentially go through different statutory criteria than the rates that are used to develop what's called the NR rate or the rate that's applicable for new large single loads. For instance, when Bonneville develops its rates for preference customers, it must include certain statutory protections that are included in Section 7b2 of the Northwest Power Act. That does not apply to the development of a rate for this new resource rate. So from our perspective, they're completely different. And so are the rates different as a practical matter? I mean, is there a structural reason why the rates will be different as opposed to what the opposing counsel is saying, which is that just as a practical matter, they have to be the same? Yeah, there's actually a statutory reason why they'll be different because Bonneville must go through different statutory processes to develop the different rates. The new resources rate is developed in accordance with Section 7f of the Northwest Power Act. The preference rates are developed in accordance with Section 7b1 of the Northwest Power Act and protections of Section 7b2. They're very different processes. And on the record, Bonneville's witnesses have also testified that even if Bonneville incurs identical costs to serve customers under the NR rate and the Tier 2 rate, the rates will invariably be different. Now, they haven't been established yet, but the point is that because of the different statutory criteria that apply to the development of the rates, they will almost certainly be different. I have just one other question about the structural argument. And they make this argument that the special treatment for DOE, Richland, and the new utilities is arbitrary and capricious. And there's some rationales to why you allow the new utilities to have the Tier 1 rate. But for the Richland facility, I didn't really see a rationale. You say, well, there's national security. They're under construction. Are you offering the Tier 1 rate to every customer who's currently under construction? No. The reason for the DOE Richland decision is that, and we actually identified this in two records of decision that are in this administrative record, is that the DOE Richland facility was in the midst of active construction activities when Bonneville initially made its determinations in these two records of decision. But are you offering it to every customer that was in the active midst, or were they the only one? Well, essentially, what we are doing with Tier 1 is developing basically what's called a contract high watermark. It's a ceiling. And at a particular date and time, and I believe that's going to be, I think it's actually October of 2010, whatever the existing load is of the customers, they get service at Tier 1. So if there's this active construction activity going on, and that would be factoring into their existing load, yes, they would be served at Tier 1. The difference with Georgia Pacific is that there is no active construction. All you have is vague, generalized references to the prospect, maybe in the future, of some expansion activities. But there's nothing on the ground. There's nothing concrete. DOE Richland is actively involved in construction and expansion activities. And so that's why we made that determination. Why does the construction matter? Excuse me? Why does the construction matter? Well, it only matters because of serving existing load. See, the difference that Bonneville made or the distinction Bonneville made during the process was really serving Tier 1 rate for existing loads, and Tier 2 applies to future load growth. So that which exists is served at the lower Tier 1 rate. That which does not yet exist will be served at the Tier 2 rate if customers choose us. Customers can choose other suppliers for that if it's preferable and it's more economic for them. But that's the distinction. So for that reason, because it's active construction, active activity, they're taking load from their utilities or they're taking load from Bonneville, and therefore, we're serving at the Tier 1 rate. Now, if the Court has no further questions on the jurisdictional aspects, I could just talk a little bit about a couple of issues here with respect to the merits that I think are important because it – well, I'd like to just touch on ripeness, actually, before getting to that, because this is a case where, first and foremost, Petitioner's claims are all based on conjecture, and they're based on conjecture about the relative levels and the relative impacts of the Tier 1 rate, the Tier 2 rate, and the NR rate. But these rates have not been established. They have not even been proposed. The rate proceeding where they will be established commences in this fall, and it is even Something just slipped by me here. We just finished an argument for why we do have jurisdiction, because the methodology is final, and now we've shifted into an argument for why we don't have jurisdiction, because the rates have not been set and it's conjectural what they'll be. Well, the difference, Your Honor, is that I think it's the nature of the claims. I think from a ripeness perspective is what are the claims that are being brought? Here, the claims that are being brought are based on conjecture. I think, conceptually, a party could be bringing a ripe challenge to Bonneville's tiered rate methodology, but I don't think these parties have. I think that's the difference with ripeness. So if we have the methodology, which you're telling us is in a final action, and so if there's a claim, the methodology violates the statute because you can only have one rate. Now, I know that's not correct because it says rate of rates, but say the statute said you can only have one rate, or you must have a melded rate, you're doing a tier 1, tier 2. That's the sort of claim that you're saying could be brought at this time that we have jurisdiction over? If it was a claim that was brought without speculating about the future impacts of the rates, I would think it's a claim the Court could have jurisdiction over. For instance, Bonneville's made determinations in the tiered rate methodology about how it would establish how much power someone would get in tier 1 or tier 2, how much what this contract high water mark is. If someone wanted to bring that challenge, that is legitimate. However, the problem with these particular challenges are the fact that they're just based on projections and speculation about what the future rates will be. This is getting more confusing instead of less. It sounds like you're saying if they try to challenge the methodology after FERC approves a final rate, they'll be too late. But they can't challenge the methodology now because the effect of it on their rate is too conjectural. So they can never challenge the methodology. Well, I think their particular challenge is, for instance, if they wanted to challenge Bonneville's, if after the rate case concludes, it turns out that their claims are correct, let's say the tier 2 rate and the NR rate are functionally equivalent. They could certainly challenge at the end of the rate case that Bonneville has improperly established its rates and that we violated a statute. But the point is their claims here are such, are based on so much conjecture that we really cannot, there's no basis upon which to make a determination. So what would happen? So it turns out that the NR rate and the tier 2 rate are identical. And they said you can't do that under the contract because the CFTF, whatever it is, is more protected. What would their recourse be? What remedy could they be since your methodology now is cast in stone? Well, if it turned out that Bonneville did not follow the correct statutory criteria in developing the rates, then I think the recourse would be that it would probably be remanded back to Bonneville to develop the rates in accordance with the correct criteria. But I think their claims are much more based on the rates. I think they're based on the rate levels. I think they're based on the rate impacts rather than on the actual methodology itself. And that's why we raised the rightness argument. For instance, there are arguments. My knowledge of this from law school, basically, in electric utility regulation, was that all the challenges to the number are, in effect, challenges to methodology. They tend to fall into challenges to the rate base, challenges to the rate of return, and challenges to the distinction of different types of customers. I don't know if you can separate them really. The way you could separate it, I think, is because in this case we're talking about a statute. And if their claims are going to be that Bonneville failed to file to follow the correct statutory procedures when it established the rates, then I think they would have a valid claim that could be pursued in the context of reviewing of this Court's review of Bonneville's rates. I mean, because it all seems to all roads for these Petitioners seems to lead back to the rate and the rate impact and the rate level, not necessarily the methodology itself. That's the core of our rightness argument. You can't challenge a rate. You can't say, well, that many pennies per kilowatt hour just seems kind of high to us. You've got to say what's wrong with the methodology for getting to the number. But if they also are contending that, for instance, they're saying Bonneville's violating the new large single load provisions of the statute, if that is the nature of their claim, that is more based on a statutory criteria of why they would claim Bonneville has – Bonneville's actions should be set aside. I don't know. But if we don't know the answer to whether they're violating that, whether the TRM violates the NLSL provisions until after the rates are set, then I'm just wondering what sort of recourse they would have at that point. You could perfectly well follow the statutory methodology pursuant to your TRM methodology and still come up with the NLSL with the new resource rates being the same as the Tier 2 rates, which is the basis of at least one of their arguments. Well, you know, but I think in a rightness perspective, one factor the Court often looks at is whether or not additional development of the record would aid the Court in the resolution of the issues. And I think it's kind of getting along that line. Would the Court benefit from the additional development that would result from the administrative record of the rate proceeding where all of these issues are flushed out, whereas here we just have a lot of projection, a lot of conjecture, a lot of speculation. Thank you, counsel. We have exhausted all the time for both sides on this case, so unless my colleagues wish to hear further rebuttal, the case is submitted.
judges: Kleinfeld, Bea, Ikuta